## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **Robert DuBoise**, | No. 8:21-CV-02328-SDM-CPT |
| Plaintiff, | |
| v. | |
| **City of Tampa, Richard R. Souviron, Det. Phillip Saladino, Det. K.E. Burke, the Estate of Det. John Counsman,**[1] and **Sgt. R.H. Price**, | |
| Defendants. | |

## <u>SECOND AMENDED COMPLAINT & DEMAND FOR A JURY TRIAL</u>

Now Comes, Plaintiff ROBERT DuBOISE, by and through his attorneys,

LOEVY & LOEVY and the HUMAN RIGHTS DEFENSE CENTER, and

complaining of the CITY OF TAMPA, RICHARD R. SOUVIRON, DET.

PHILLIP SALADINO, DET. K.E. BURKE, THE ESTATE OF DET. JOHN

COUNSMAN AND SGT. R.H. PRICE, alleges as follows:

1.      Robert DuBoise was wrongly convicted of the 1983 murder of

B.G.[2], a crime he had nothing to do with.

---

[1] Plaintiff has named the Estate of Det. John Counsman as a Defendant in this action. Pursuant to the Court's order, dkt. 32, Plaintiff is seeking appointment of a Special Representative for Counsman's Estate.

[2] The victim is referred to by her initials.

2.     Mr. DuBoise was just 18 years old when he was arrested. He was initially sentenced to death and spent nearly 37 years in prison before DNA evidence exonerated him.

3.     Mr. DuBoise had nothing to do with the crime and he has always maintained his innocence.

4.     The only physical evidence implicating Mr. DuBoise was fabricated "bitemark" evidence that supposedly matched Mr. DuBoise to an injury on the victim's body. In fact, the victim's injury was not a human bitemark at all.

5.     This "bitemark" evidence was knowingly fabricated by Defendant Souviron, a forensic odontologist, in conspiracy with Detectives K.E. Burke and John Counsman and Sergeant R.H. Price.

6.     K.E. Burke, John Counsman, and R.H. Price also fabricated evidence and withheld exculpatory evidence relating to jailhouse informants, falsely contending that Mr. DuBoise confessed to the crime.

7.     Based on this illegitimate and fabricated evidence, Mr. DuBoise was convicted of murder and sentenced to death. From age 20 to 23, Mr. DuBoise was on death row; his sentence was reduced to life in prison in 1988.

8.     Finally, in 2020, critical DNA evidence that was believed to have been lost was uncovered. DNA testing conclusively proved Mr. DuBoise's innocence and identified the real killer(s)—people with no connection to Mr.

DuBoise. As a result, Mr. DuBoise's conviction was overturned and he was released.

9.     Mr. DuBoise, now a free man for the first time since 1983, brings this suit to vindicate the deprivations of his constitutional rights that caused him to spend close to 40 years in prison as an innocent man.

## Jurisdiction & Venue

10.     This action is brought pursuant to 42 U.S.C. § 1983 and Florida law to redress Defendants' tortious conduct and their deprivations of Mr. DuBoise's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction of Mr. DuBoise's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Mr. DuBoise's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Mr. DuBoise's conviction.

## Parties

13.     Plaintiff Robert DuBoise spent nearly 37 years incarcerated for a crime he did not commit.

14.     At all times relevant to the events described in this Complaint, Defendants Phillip Saladino, K.E. Burke, and now-deceased Detective John

Counsman were detectives in the Tampa Police Department. For purposes of this Complaint, Saladino, Burke and Counsman are collectively referred to as "Police Officer Defendants."

15. Detective John Counsman died before this Complaint was filed, and the Estate of John Counsman is sued as successor in interest to John Counsman.

16. At all times relevant to the events described in this Complaint, Defendant R.H. Price was a sergeant in the Tampa Police Department. Defendant Price and other unknown law enforcement officers supervised Defendants Saladino, Burke, and Counsman.

17. Defendant Dr. Richard R. Souviron is a dentist and forensic odontologist. At all times relevant to this action, Defendant Souviron was a state actor insofar as he was jointly engaged with the Defendant Officers in conducting the investigation that led to Mr. DuBoise's wrongful conviction; he conspired with the Defendant Officers to secure Mr. DuBoise's wrongful conviction; he served a public function; and/or he was given authority by the Defendant Officers to identify the perpetrator of the murder for which Mr. DuBoise was wrongly convicted.

18. Defendant City of Tampa is a municipal corporation that is or was the employer of Defendants Saladino, Burke, Counsman, and Price. Each of the Defendants named in this Complaint acted during their investigation of

the B.G. homicide as agents or employees of the City of Tampa. The City of Tampa is liable for all torts committed by the Defendants pursuant to the doctrine of respondeat superior. Additionally, the City of Tampa is responsible for the policies and practices of the Tampa Police Department, and is liable for the violations of Plaintiff's rights caused by the unconstitutional policies and customs of the Tampa Police Department, including actions of the above-named Defendants employed by the City of Tampa undertaken pursuant to those policies and customs during the B.G. homicide investigation.

19.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

## The Murder & Initial Investigation

20.     On August 19, 1983, B.G.'s body was discovered behind an office building on North Boulevard in Tampa, Florida. B.G. had been the victim of a sexual assault.

21.     The next day, the medical examiner, Dr. Miller, conducted an autopsy of B.G. Defendants Saladino and Burke attended the autopsy.

22.     During the autopsy, either Dr. Miller or Tampa Police Officer Fletcher pointed out a purported "bitemark" on B.G.'s cheek. In reality, this injury was not even a human bitemark.

23.     Dr. Miller photographed the "bitemark" injury, removed it from the victim's face, and placed it in formaldehyde—thus effectively destroying it for the purposes of forensic comparison.

24.     Despite the fact that there were no eyewitnesses to the crime, the initial investigation into the crime revealed a number of promising leads. But instead of conducting a legitimate homicide investigation, the Police Officer Defendants reached an agreement among themselves to "solve" the case using bitemark evidence.

## Defendants' Early Investigation

25.     To use bitemark evidence to close the case, the Police Officer Defendants conspired with Defendant Souviron.

26.     Defendant Burke was an avid follower of Defendant Souviron and bitemark evidence.

27.     Defendants Burke and Saladino knew that they could count on Defendant Souviron to reach any conclusion about bitemark identifications they wanted, regardless of whether the identification had any legitimate forensic or scientific basis.

28.     Indeed, prior to Mr. DuBoise's criminal trial, Defendant Souviron spoke at the International Association of Chiefs of Police (IACP) conference and told officers, among other things:

a. "If you tell me that is the guy that did it, I will go into Court and say that is the guy that did it."

b. "Did that tooth make the hole in the Defendant's finger? I think so. I think so because the police said he's guilty."

c. "If the detectives say he did it, I am going to go in there and say he did it."

29.     On or about September 6, 1983, either Defendant Burke or Defendant Saladino reached out to Defendant Souviron to get him to assist with the case. Two days later, Defendant Souviron flew to Tampa to review the "bitemark" evidence. At that time, Dr. Souviron told Defendants Saladino and Burke that they were looking for a perpetrator with a missing front tooth or a gap between the two front teeth. In fact, according to Dr. Souviron's notes, there should have been a four to five millimeter gap between the two upper central incisors.

30.     Plaintiff's teeth did not have a gap between the two upper central incisors, as demonstrated below.



31.     Defendant Souviron instructed Defendants Saladino and Burke to make dental models using beeswax.

32.     Defendant Burke developed beeswax models with the assistance of his wife. Neither Defendant Burke nor his wife had any training in dental molds, dentistry or forensic odontology.

33.     Defendant Souviron knew that beeswax was not a proper medium to use for making dental impressions. Beeswax is too soft, and therefore can neither hold its shape nor preserve fine contours or spaces between teeth.

34.     As Souviron and the other Defendants knew, a bitemark impression in beeswax was scientifically unreliable and could not be used to make a legitimate forensic identification or exclusion.

35.    The officers used beeswax not for any legitimate reason, but only because another officer in the Tampa Police Department operated a honey business on the side.

36.    In 1983, no reasonable dentist or forensic odontologist believed that bitemark molds made from beeswax impressions constituted a reliable or generally accepted basis for either identifying or excluding potential murder suspects.

## Defendants' Fabricate Bitemark Evidence

37.    Defendants had no reason to believe that Mr. DuBoise was involved in B.G.'s assault or murder. There was no evidence implicating him in the crime and his dentition did not match the description of the suspect's dentition that Dr. Souviron had given to Defendants Saladino and Burke.

38.    Nonetheless, the Defendants zeroed in on Plaintiff because of a statement made by Terry Joseph, a former employee of Eastern Station, which was a gas station across the street from where B.G. was found. Joseph worked at Eastern Station back in February 1983—six months before B.G. was murdered—and she worked at Eastern Station only for a total of two weeks.

39.    Joseph told the Defendants that back in February 1983, she remembered three boys named Robert, Bo, and Ray causing trouble.

40.    From this "evidence," the Defendants decided that Plaintiff was a murderer.

41.    Defendant Saladino located Mr. DuBoise and had him give a bitemark impression in beeswax. Defendants Saladino and/or Burke took the beeswax mold to another local dentist, Dr. Richard Powell, who made a stone cast from the beeswax impression.

42.    Defendants Saladino and Burke sent Defendant Souviron Mr. DuBoise's beeswax impressions.

43.    Even though Defendant Souviron knew that the beeswax impression was not a reliable medium for conducting bitemark analysis and could not be used to include a particular suspect, on or about October 21, 1983, Defendant Souviron told Defendant Burke that Mr. DuBoise was the one who had bitten the victim at the time of her death.

44.    Souviron's conclusion was fabricated: Plaintiff had nothing whatsoever to do with the murder of B.G., and his teeth did not match the "bitemark."

45.    Defendant Souviron knew that his findings were fabricated: Among other things, Mr. DuBoise's teeth did not match the description of the suspect's dentition that Defendant Souviron had given to Defendants Saladino and Burke based on his view of the evidence prior to seeing Mr. DuBoise's dentition.

46.     Moreover, Defendant Souviron knew that he could draw no conclusions about the connection between the "bitemark" and the beeswax impression of Mr. DuBoise's teeth because of the unreliability of beeswax.

47.     The Defendants knew that the supposed "match" between Mr. DuBoise's dentition and the "bitemark" was fraudulent, unscientific, and did not furnish probable cause to link him to B.G.'s murder in any way.

48.     Nevertheless, the Defendants, relying on the conduct of Defendant Souviron, used this phony bitemark identification based on a beeswax mold to arrest Robert DuBoise.

49.     In fact, Defendant Saladino admitted that once Defendant Souviron stated that Mr. DuBoise made the "bitemark," the investigation stopped.

50.     In particular, notwithstanding the fact that the fingerprint analysis and microscopic hair analysis excluded Mr. DuBoise as the perpetrator, the Police Officer Defendants abandoned any investigation into the identity of the real perpetrator.

51.     Defendants Burke and Saladino documented false investigative information pertaining to the bitemark analysis in police reports.

52.     These false police reports were approved by Defendant Price.

53.     Defendant Souviron's bitemark analysis (which was relayed to and adopted by the Police Officer Defendants; which the Defendants knew was

false and unreliable; and which they used to arrest and prosecute Mr. DuBoise), was the only physical or forensic "evidence" linking Mr. DuBoise to the crime.

54. After his arrest, the Defendants took additional molds from Mr. DuBoise. Because he had nothing whatsoever to do with the crime, Mr. DuBoise knew that the dental molds would exonerate him and voluntarily complied with the Defendants' request for molds and photographs.

55. Although he knew that no such match existed, including because there were obvious differences between Mr. DuBoise's dentition and the "bitemark," Defendant Souviron claimed—after viewing Mr. DuBoise's additional dental molds—that Mr. DuBoise made the bitemark on B.G.'s face. That conclusion, like his previous one, was entirely fabricated.

**Defendants Fabricate and Suppress
Evidence Relating to Jailhouse Informants**

56. Even after Mr. DuBoise's arrest, Defendants knew that their case against Mr. DuBoise was weak because it rested solely on fabricated bitemark evidence.

57. The Police Officer Defendants conspired to conjure additional false evidence against Mr. DuBoise to ensure that he would be prosecuted and convicted.

58.     Specifically, the Police Officer Defendants reached an agreement to fabricate statements by informants who would falsely testify that Mr. DuBoise had confessed to the crime while in custody.

59.     In fact, Mr. DuBoise never confessed to anyone because he has maintained his innocence from day one.

60.     For example, the Defendants conspired with a man named Claude Butler to concoct a story that Mr. DuBoise confessed to the murder.

61.     In the 1980s, Butler suffered from significant mental health problems and had been admitted to the Georgia State Hospital.

62.     At the time of the investigation into the murder of B.G., Butler was in the Hillsborough County Jail awaiting trial on an unrelated charge of kidnapping and robbery and was facing up to two life sentences in prison.

63.     Butler's mental health challenges continued during this time: He admitted to having flashbacks from his prior arrest, seeing the walls melt, and hearing voices. Butler was taking several medications to treat these psychiatric conditions, including an antipsychotic drug.

64.     Butler was an informant for Defendant Counsman; he described Counsman as his "handler."

65.     On information and belief, Defendants Counsman and Saladino were aware of Butler's mental health history and attendant medications.

66. Sometime in November 1983, Butler and Mr. DuBoise were housed in the same area in the Hillsborough County Jail. Butler met with Defendant Counsman and Saladino regarding the investigation into the murder of B.G. and the prosecution of Mr. DuBoise.

67. Defendant Saladino asked Butler to see what he could do for them on Mr. DuBoise's case, or words to that effect.

68. Defendants Counsman and/or Saladino met with Butler five or six times regarding Mr. DuBoise's case but did not memorialize each of these meetings. With Butler's cooperation, Defendants Counsman and Saladino knowingly fabricated a story that Mr. DuBoise had confessed to the murder. However, over the course of those meetings and even throughout the criminal proceedings, Butler's account of Mr. DuBoise's alleged confession changed, including in significant ways.

69. On information and belief, during one or more of those five to six meetings Defendants Counsman and Saladino secured Butler's cooperation in their fabrication by making promises, threats and inducements, including threats related to Butler's criminal case.

70. The Police Officer Defendants then documented this false story in fabricated police reports, which were approved by Defendant Price.

71. Mr. DuBoise had never made any such confession.

72.     Indeed, the purported confession that Butler alleged Mr. DuBoise made was not corroborated by the physical evidence or other known information about the case.

73.     Defendants Saladino and Counsman were aware that the statements they reported Butler provided to them were unreliable and false. Nonetheless, Defendants Saladino and Counsman memorialized this information knowing that it was false and relied on it for the continued prosecution of Mr. DuBoise.

74.     For example, the "confession" described by Butler also implicated Victor DuBoise and Ray Garcia.  No evidence existed tying Victor DuBoise and Ray Garcia to the crime. Indeed, Victor DuBoise and Mr. Garcia were never arrested, let alone prosecuted for the offense.

75.     Similarly, the confession involved Mr. Garcia hitting the victim with a stick; she was bludgeoned to death with 2 x 4 boards.

76.     The Defendants' misconduct in manufacturing and obtaining these statements from Butler was never disclosed to prosecutors, Mr. DuBoise, or Mr. DuBoise's criminal defense attorneys.

77.     Nor did Defendants Saladino or Counsman document or disclose to the prosecutor the fact that they met with Butler on five to six occasions.

78.     During one of Defendant Saladino's visits to Butler, possibly alongside other Defendants, a polygraph examination was administered to

Butler. On information and belief, that polygraph examination showed that Butler had been deceptive.

79. That polygraph examination and its outcome were never documented in a police report, and the fact that the polygraph examination took place was never disclosed in any form to prosecutors or defense attorneys before or during Mr. DuBoise's prosecution.

80. Just weeks before Mr. DuBoise's trial, another informant named Jack Andruskiewiecz, who, like Butler, was facing criminal felony charges at the time, made statements supposedly inculpating Mr. DuBoise.

81. Andruskiewiecz had never previously provided any information related to this investigation. Nevertheless, twelve days before trial and almost two and a half years after the crime, Andruskiewiecz stated that Mr. DuBoise had told him that he was "wanted for murder."

82. Based on information and belief, the Police Officer Defendants procured false statements from Andruskiewiecz using similar tactics to those they employed with Butler.

**DuBoise Is Tried and Convicted Based on Fabricated Evidence**

83. Between 1983 and 1985, as the result of Defendants' misconduct and based solely on Defendants' fabricated evidence described in this Complaint, Mr. DuBoise was prosecuted and convicted of B.G.'s murder.

84.     The only "evidence" linking Mr. DuBoise to the crime was the fabricated bitemark evidence and fabricated informant testimony of Butler and Andruskiewiecz.

85.     The sum total of the evidence that supposedly created probable cause for Mr. DuBoise's arrest and prosecution was the result of deliberate fabrication by Defendants.

86.     At no point in time, including before and after Mr. DuBoise's arrest and prosecution, was there probable cause to believe that Mr. DuBoise committed or was in any way involved in B.G.'s murder.

87.     In the absence of Defendants' misconduct, Mr. DuBoise would never have been arrested, prosecuted, or convicted.

88.     The Defendants' fabrication of evidence was not disclosed to prosecutors, Mr. DuBoise, or his criminal defense attorneys in advance of his criminal trial.

89.     The Defendants also wrote false police reports and gave false statements before trial, which were the basis for charging and prosecuting Mr. DuBoise.

90.     At all times, the Defendants suppressed the true circumstances surrounding the "bitemark" evidence and the testimony of the informants.

91. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence, including information still unknown to Mr. DuBoise, which would also have shown his innocence.

92. Mr. DuBoise maintained his innocence throughout the proceedings.

93. However, because of the Defendants' false and manufactured evidence, Mr. DuBoise was wrongly convicted.

## Plaintiff's Damages

94. When Mr. DuBoise was arrested and charged with the murder of B.G., he was just 18 years old.

95. Mr. DuBoise was convicted on March 7, 1985.

96. Upon his conviction, Mr. DuBoise was sentenced to death and faced execution for a crime he did not commit.

97. From 1985 to 1988, Mr. DuBoise was on death row before his sentence was reduced to life in prison.

98. In total, Mr. DuBoise spent nearly 37 years in prison as an innocent man.

99. Mr. DuBoise was taken away from, and missed out on, the lives of his family and friends. He missed special occasions and milestones, and he returned home to relationships changed by or lost to nearly four decades of wrongful incarceration.

100.  Mr. DuBoise was robbed of his teenage years and his young adulthood. He was deprived of opportunities to start a family, gain an education, engage in meaningful labor, develop a career, and pursue his interests and passions. Mr. DuBoise has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

101.  During his 36 years of wrongful imprisonment, Mr. DuBoise was detained in harsh and dangerous conditions in maximum-security prisons. During that time, Mr. DuBoise witnessed the stabbing and killing of other inmates. Mr. DuBoise feared for his own safety and was himself the victim of violence, including an attempt on his life.

102.  In all that time, Mr. DuBoise never knew whether the truth would come out or whether he would ever be exonerated.

103.  In addition to the severe trauma of wrongful imprisonment and Mr. DuBoise's loss of liberty, the Defendants' misconduct continues to cause him extreme psychological and emotional pain and suffering.

104.  Mr. DuBoise has been branded as a killer and a rapist. He was sentenced to die for a crime he did not commit, and has suffered profound, irreparable harm to his reputation as a result.

## Mr. DuBoise's Exoneration

105.   Mr. DuBoise fought hard to prove his innocence over almost four decades of wrongful imprisonment.

106.   In 2006, Mr. DuBoise filed a motion for post-conviction DNA testing. The court denied the motion after a hearing in 2008 where the State represented that all the evidence admitted at Mr. DuBoise's trial had been destroyed in 1990.

107.   In 2020, however, it came to light that the victim's vaginal slide, which was created during the autopsy, was still in the possession of the Medical Examiner.

108.   DNA testing on that slide affirmatively excluded Mr. DuBoise.

109.   Instead, the DNA testing matched to two different male profiles. One of those profiles was matched to an individual through a CODIS database search. That individual has no connection whatsoever to Mr. DuBoise.

110.   This DNA testing conclusively excludes Mr. DuBoise as the perpetrator and proves his innocence of the heinous crime for which he was convicted.

111.   In 2020, Mr. DuBoise moved to vacate his conviction based on the newly-discovered, exonerating DNA evidence and the inherently unscientific and unreliable nature of the bitemark identification.

112. Indeed, further review of the "bitemark" demonstrated that it was not even a human bitemark.

113. The State joined the motion and recommended that the Court find Mr. DuBoise innocent of the charges against him and fully exonerate him.

114. The court granted the motion and vacated Mr. DuBoise's conviction.

115. On July 20, 2021, Plaintiff served a Notice of Claim for his state law claims against the City of Tampa and Police Officer Defendants. Notice was served electronically on July 20, 2021 and by certified mail three days later. To date, no response has been provided.

116. A free man for the first time since he was a teenager, Mr. DuBoise must now put his life back together after almost 40 years in prison. Mr. DuBoise brings this suit to vindicate the deprivations of his rights that caused his wrongful detention, prosecution, and incarceration.

## Count 1
## 42 U.S.C. § 1983 – Due Process
## (Fourteenth Amendment)

117. As set forth in paragraphs 24-94, Defendants Burke, Saladino, Price, Counsman, and Souviron, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mr. DuBoise of his constitutional right to due process and his right to a fair trial.

118. In the manner described more fully above, the Defendants fabricated and solicited false evidence, including false bitemark evidence, false witness statements, fabricated police reports and other evidence falsely implicating Mr. DuBoise in the crime, obtained charges against Mr. DuBoise, secured his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Mr. DuBoise during his criminal case.

119. The Defendants also deliberately withheld exculpatory evidence from prosecutors and Mr. DuBoise, and Mr. DuBoise's criminal defense attorneys, including: evidence contradicting the supposed bitemark identification; evidence relating to the Defendants' fabrication of statements by informants; additional material evidence relating to witnesses, such as undisclosed polygraph examinations; and the fact that Defendants fabricated police reports, thereby misleading and misdirecting the criminal prosecution of Mr. DuBoise.

120. In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Mr. DuBoise.

121. The Defendants' misconduct described in this count resulted in the unjust and wrongful criminal prosecution and conviction of Mr. DuBoise and the deprivation of his liberty, thereby denying his constitutional right to a fair

trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. DuBoise could not have, and would not have, been pursued.

122. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. DuBoise's innocence.

123. As a result of Defendants' misconduct described in this count, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in paragraphs 95-105, 115.

124. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

### Count 2
### 42 U.S.C. § 1983 – Illegal Detention and Prosecution
### (Fourth Amendment)

125. As set forth in paragraphs 24-94, Defendants Burke, Saladino, Price, Counsman and Souviron, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. DuBoise of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. DuBoise

without any probable cause for doing so and in spite of the fact that they knew Mr. DuBoise was innocent, in violation of his rights secured by the Fourth Amendment.

126. In so doing, the Defendants caused Mr. DuBoise to be deprived of his liberty without probable cause, detained without probable cause, and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

127. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. DuBoise's innocence.

128. As a result of Defendants' misconduct described in this count, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in paragraphs 95-105, 115.

129. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

## Count 3
## 42 U.S.C. § 1983 – Failure to Intervene

130.  As set forth in paragraphs 24-94, Defendants Burke, Saladino, Price, Counsman, and Souviron, during the constitutional violations described in this Complaint, stood by without intervening to prevent the violation of Mr. DuBoise's constitutional rights, even though they had the duty and the opportunity to do so.

131.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. DuBoise's innocence.

132.  As a result of Defendants' failure to intervene to prevent the violations of Mr. DuBoise's constitutional rights, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in paragraphs 95-105, 115.

133.  The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

## Count 4
## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

134.   As set forth in paragraphs 24-94, Defendants Burke, Saladino, Price, Counsman, and Souviron, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. DuBoise for B.G.'s murder, regardless of Mr. DuBoise's guilt or innocence, and thereby to deprive him of his constitutional rights.

135.   In so doing, the Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

136.   In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. DuBoise of his rights.

137.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

138.   As a result of the Defendants' agreement, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in paragraphs 95-105, 115.

139.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless

indifference to the rights of others, and/or in total disregard of the truth and of Mr. DuBoise's innocence.

140.   The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

## Count 5
## 42 U.S.C. § 1983 – Policy & Custom Claims Against the City of Tampa

141.   The City of Tampa employed individual Defendants Saladino, Burke, Price, and Counsman, supervised them, and promulgated policies (including both written policies and unwritten customs) that caused the wrongful conviction of Mr. DuBoise.

142.   Mr. DuBoise's injuries described in this Complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the City of Tampa, as well as by the actions of policy-making officials for the City of Tampa.

143.   At all times relevant to the events described in the Complaint and for a period time before and after, the City of Tampa either had inadequate rules, regulations, policies, procedural safeguards, or failed to promulgate adequate rules, regulations, policies, procedural safeguards governing: the use of forensic scientific methods during criminal investigations, including but not limited to bitemark evidence; the collection, documentation, preservation,

testing, and disclosure of material exculpatory evidence, and impeachment evidence; the use of and reliance on statements by informants, including the use of promises, agreements, or other inducements for their cooperation; the documentation and disclosure of any interactions with, or information, statements or incentives provided by or to informants; the writing of police reports and taking of investigative notes; and the maintenance of investigative files and the disclosure of files in criminal proceedings.

144. In addition, or alternatively, the City of Tampa failed to properly train and supervise officers and agents of the Tampa Police Department with respect to the use of forensic scientific methods during criminal investigations, including but not limited to bitemark evidence; the collection, documentation, preservation, testing, and disclosure of material exculpatory evidence and impeachment evidence; the use of and reliance on statements by informants, including the use of promises, agreements, or other inducements for their cooperation; the necessary documentation attendant to the use of and reliance on informants; the writing of police reports and taking of investigative notes; and the maintenance of investigative files and the disclosure of files in criminal proceedings.

145. Officers and agents of the City of Tampa failed to promulgate proper or adequate rules, regulations, policies, and procedures

notwithstanding the obvious need for such rules, regulations, policies, and procedures.

146. For example, on information and belief, there was no training on disclosure obligations, *Brady v. Maryland*, 373 U.S. 83 (1963), or how to handle and/or document interactions with informants.

147. The need for this type of training, however, was obvious. In *Connick v. Thompson*, 563 U.S. 51 (2001), while the Supreme Court held that the need to train prosecutors about their disclosure obligations was not obvious given their legal background, it distinguished prosecutors from police. Because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations.

148. As early as 1963, the Supreme Court held in *Brady v. Maryland* that the prosecution has an obligation to disclose exculpatory evidence to a criminal defendant—a ruling that was extended to impeachment evidence a decade later. By at least 1976, the Fifth Circuit extended *Brady* obligations to evidence relating to informants. *See United States v. Joseph*, 533 F.2d 282 (1976). In fact, the issue of the prosecution's disclosure obligations vis-a-vis informants was the subject of litigation during this time period.

149. So obvious was the need for training on these issues, that the International Association of Chiefs of Police (IACP) held contemporaneous

workshops during which these issues were discussed. Officers at the conference, including from Florida, explained that informants "require very careful control" and officers need to be aware of "the damage they can cause." As a result, officers discussed the importance of sufficient "documentation of informant activities."

150. Likewise, during another IACP workshop, officers discussed the need for training and the exposure that departments with insufficient training face.

151. In addition to the fact that it was "obvious" that the City of Tampa needed to promulgate adequate policies and provide adequate training to ensure officers complied with their constitutional obligation, the City of Tampa had notice that such policies and training were necessary from prior allegations of misconduct. Indeed, there were a number of such allegations, which provided notice to the City prior to Mr. DuBoise's criminal prosecution.

152. For example, in 1973, a grand jury found that six detectives in the Tampa Police Department had engaged in misconduct that was "shocking beyond words," including the fact that on numerous occasions detectives had committed perjury and falsified information about informants because of the pressure within the department to make arrests. Testimony during those grand jury proceedings revealed that supervising officers, including the Chief

of Police for the Tampa Police Department knew of this misconduct but did nothing to correct it.

153. Indeed, the 1973 grand jury inquiry issued a seventeen-page report that included in its findings that the police "on numerous occasions" had provided false information about the reliability and believability of the confidential informants that the detectives relied upon for seeking search warrants.

154. The testimony presented to the grand jury included testimony that a detective had reported to a supervisor use of an illegal wiretap and testimony from another officer suggesting to his supervisor that drugs be illegally planted on a suspect. The testimony also included evidence that despite the supervisor's knowledge of this misconduct, no disciplinary action was taken.

155. One of the specific recommendations made in the 1973 grand jury report was for the Department to better monitor officers' use of confidential informants.

156. Additionally, the grand jury recommended that the City increase its training of officers so that their conduct conformed to the legal requirements, as well as work more closely with prosecutors to ensure that officers fulfil their constitutional duties when investigating cases.

157. Moreover, the grand jury noted the City's deficiencies in maintaining and storing evidence.

158. This misconduct—relating to fabrication of evidence and improper handling of informants—is similar in kind to that alleged against the Defendants here, during their investigation into B.G.'s homicide and arrest and prosecution of Plaintiff.

159. Additionally, in the mid-1980s, a Tampa police officer named Francisco Pijuan was removed from the force and criminally prosecuted for conspiracy and attempted official misconduct after a tape recording captured Pijuan coaching a confidential informant to lie in connection with a 1984 investigation and arrest.

160. Pijuan's coaching of an informant—and then lying to cover it up—occurred prior to Defendants' misconduct here, and is highly analogous to that which Plaintiff alleges against the Defendants.

161. Also around the same time as Plaintiff's arrest and prosecution, Defendant Burke committed nearly identical misconduct during the investigation into the murder of Lisa DeCarr. Ms. DeCarr was last seen in March 1983 and her body was found a year later. Just as Plaintiff has alleged here, in the DeCarr investigation, During the criminal investigation, Defendant Burke failed to disclose important information regarding his investigation, including his contacts with the victim's boyfriend.

162. These are just three prior incidents of many that would have put the City of Tampa on notice of its deficient policies and training. *See,*

*e.g.*, *Butler v. Gualtieri*, No. 8:19-CV-2771-T-60TGW, 2020 WL 6161472, at *1 (M.D. Fla. Oct. 21, 2020) (denying motion to dismiss *Monell* claim against sheriff's department where complaint alleged three other incidents limited to six other officers). Indeed, the type of misconduct that occurred during the B.G. homicide investigation was common in the Tampa Police Department.

163.    That misconduct continued even after Plaintiff's conviction. For example, shortly after Mr. DuBoise's conviction, during the 1987 investigation into the murder of Katrina Graddy, Tampa police officers engaged in misconduct that resulted in the wrongful conviction of Rudolph Holton. Specifically, the Tampa Police Department procured faulty forensic evidence that a hair found in the victim's mouth matched Holton. Tampa police officers also procured inculpatory statements by a jailhouse informant, which the informant ultimately recanted. Holton was convicted and sentenced to death before eventually being exonerated by DNA testing that proved his innocence.

164.    Not only does the misconduct that occurred in connection with the Holton arrest and prosecution parallel that which Plaintiff has alleged here, but also that type of misconduct continued in the Tampa Police Department even into the 1990s. For example, during the 1995 investigation into the murders of Douglas Lawson and Sherry McCoy-Ward, Tampa police detectives made improper promises to five jailhouse informants in order to pin the crime on Joaquin Jose Martinez. In part due to this fabricated jailhouse informant

testimony, Martinez was convicted and sentenced to death. Martinez's conviction was overturned and he was acquitted following a retrial in which the informants did not testify.

165. Finally, in addition to having notice of the need for proper training and policies because the need was "obvious" and because of prior instances of misconduct, the City also had notice through supervision of its officers, and successful motions, and reported and unreported cases.

166. In short, given the foregoing, at all times relevant to the events described in this Complaint and for a period of time before and after, the City of Tampa had notice of practices and customs of officers and agents of the Tampa Police Department that included one or more of the following: (1) officers fabricated evidence and reports relating to forensic evidence; (2) officers fabricated statements from jailhouse informants and incentivized informants; (3) officers failed to properly document and disclose their interactions with informants; (4) officers provided promises and inducements to informants, and failed to properly disclose those promises or inducements to the criminal justice system; and, (5) officers failed to disclose exculpatory evidence during criminal trials.

167. These practices and customs, individually and/or together, flourished because the leaders, supervisors, and policymakers of the City of Tampa directly encouraged, and were thereby the moving force behind, the

very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper investigative techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Mr. DuBoise.

168.    The above practices and customs, so well settled as to constitute de facto policies of the City of Tampa, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169.    Mr. DuBoise's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the City of Tampa, including but not limited to the Defendants, who acted pursuant to one or more of the policies, procedures, and customs set forth above in engage in the misconduct described in this Complaint.

**Count 6**
**State Law Claim – Malicious Prosecution**

170.    Plaintiff incorporates paragraphs 24-94 as if fully restated here.

171.    In the manner described above, Defendants Souviron, Counsman, Price, Saladino and Burke, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. DuBoise of criminal activity and exerted influence to initiate,

continue, and perpetuate judicial proceedings against Mr. DuBoise without any probable cause for doing so.

172.   In so doing, the Defendants caused Mr. DuBoise to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and/or continued maliciously, resulting in injury.

173.   The judicial proceedings terminated in Mr. DuBoise's favor and in a manner indicative of his innocence when his conviction was vacated and/or all charges against him were dropped. This constituted a bona fide termination of the proceedings.

174.   The misconduct described in this count was undertaken with reckless indifference to the rights of others and/or in total disregard of the truth and of Mr. DuBoise's innocence.

175.   As a result of the Defendants' agreement, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## Court 7
## State Law Claim – Intentional Infliction of Emotional Distress

176.   Plaintiff incorporates paragraphs 24-94 of this Complaint as if fully restated here.

177.   The actions, omissions, and conduct of Defendants Souviron, Price, Counsman, Saladino and Burke, as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, and/or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. DuBoise, as is more fully alleged above.

178.   Defendants' misconduct in deliberately fabricating evidence and suppressing exculpatory evidence in order to secure Mr. DuBoise's wrongful murder conviction goes beyond all possible bounds of decency and is atrocious and intolerable.

179.   As a result of the Defendants' misconduct described in this count, Mr. DuBoise experienced severe suffering, including loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count 8
## State Law Claim – Negligent Hiring, Supervision, and Retention

180.  Plaintiff incorporates paragraphs 24-94 of this Complaint as if fully restated here.

181.  As alleged more fully above in Count 5, Defendant City of Tampa had notice of widespread practices and customs within the Tampa Police Department whereby law enforcement officers, including the Police Officer Defendants, routinely (1) fabricated evidence and reports relating to forensic evidence; (2) fabricated statements from jailhouse informants and incentivized informants; (3) provided promises and inducements to jailhouse informants and incentivized informants, and failed to properly disclose those promises or inducements to the criminal justice system; (4) failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and (5) failed to disclose exculpatory evidence during criminal trials.

182.  As alleged more fully above in Count 5, Defendant City of Tampa failed to adequately train or discipline officers in the Tampa Police Department, including Defendants, regarding the use of forensic scientific methods during criminal investigations, including but not limited to bitemark evidence; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence, and impeachment evidence; reliance on statements by incentivized informants or

jailhouse informants, including the use of promises, agreements, or other inducements for their cooperation; the writing of police reports taking of investigative notes; and the maintenance of investigative files and the disclosure of files in criminal proceedings.

183.   The City of Tampa, acting through its agents and policymakers, knew or should have known that the Defendant Police Officers were unfit and incompetent at conducting criminal investigations.

184.   At all times relevant to this complaint, Defendant City of Tampa failed to adequately supervise its employees engaged in criminal investigations, which permitted those employees, including the individual Defendants, to engage in misconduct.

185.   As a result of the Police Officer Defendants' misconduct described in this count, Mr. DuBoise experienced severe suffering, including loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count 9
## State Law Claim – Civil Conspiracy

186.   Plaintiff incorporates paragraph 24-94 of this Complaint as if fully restated here.

187.   As described more fully above, Defendants Souviron, Price, Saladino, Burke and Counsman, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. DuBoise for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. DuBoise of his rights.

188.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

189.   The Defendants' acts of misconduct detailed in this complaint were overt acts undertaken in pursuance of the conspiracy.

190.   The violations of law described in this Complaint were accomplished by the Defendants' conspiracy.

191.   The misconduct described in this count was objectively unreasonable and was undertaken with reckless indifference.

192.   As a result of the Defendants' agreement, Mr. DuBoise suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

### Count 10
### State Law Claim – Respondeat Superior

193. Plaintiff incorporates paragraphs 24-94 of this Complaint as if fully restated here.

194. While committing the misconduct alleged in this Complaint, the Police Officer Defendants were employees, members, and agents of the City of Tampa, acting at all relevant times within the scope of their employment.

195. Defendant City of Tampa is liable as principal for all torts committed by its agents.

### Count 11
### State Law Claim – Indemnification

196. Plaintiff incorporates paragraphs 24-94  of this Complaint as if fully restated here.

197. The City of Tampa is obligated under law to pay any tort judgment against its employees or agents.

198. The Police Officer Defendants were employees, members, and agents of the City of Tampa, acting at all relevant times within the scope of their employment in committing the misconduct described in this Complaint.

199. The City of Tampa is responsible to pay any judgment entered against the Police Officer Defendants. Mr. DuBoise therefore demands

judgment against Defendant City of Tampa, in the amounts awarded to Mr. DuBoise against the Police Officer Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff ROBERT DuBOISE respectfully requests that this Court enter a judgment in his favor and against Defendants City of Tampa, Richard R. Souviron, Det. Phillip Saladino, Det. K.E. Burke, The Estate of Det. John Counsman, and Sgt. R.H. Price; awarding compensatory damages, attorneys' fees, and costs against each Defendant; awarding punitive damages against each of the individual Defendants; and any other relief that this Court deems just and appropriate.

## Demand for a Jury Trial

Plaintiff ROBERT DuBOISE hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**Robert DuBoise**

By:  /s/ Gayle Horn
        *One of DuBoise's Attorneys*

Jon Loevy                              Daniel Marshall
Gayle Horn                             Jesse Isom
Heather Lewis Donnell                  Human Rights Defense Center
John Hazinski                          P.O. Box 1151
LOEVY & LOEVY                          Lake Worth, FL 33460
311 N. Aberdeen St.                    (561) 360-2523
Chicago, IL 60607
(312) 243-5900