UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT DUBOISE,

    Plaintiff,

v.                                                    CASE NO. 8:21-cv-2328-SDM-CPT

CITY OF TAMPA, et al.,

    Defendants.
_____/

**ORDER**

After DNA analysis of newly-discovered evidence "affirmatively excluded him" as a suspect and resulted in the vacatur of his 1985 conviction for murder, Robert DuBoise sues (Doc. 62) the City of Tampa, several former officers of the Tampa Police Department, and a forensic odontologist who allegedly proffered false testimony analyzing "bitemark evidence" that secured DuBoise's conviction. The eleven-count complaint asserts against Tampa a claim under 42 U.S.C. § 1983 (Count 5) and claims under Florida law (Counts 8–11). Tampa moves (Doc. 63) to dismiss. DuBoise "withdraws" each claim against Tampa except Count 11, which claims that Tampa must indemnify each officer defendant, and Count 5.

Because DuBoise "withdraws" each claim asserted against Tampa in Counts 8 through 10, because the indemnity claim (to the extent one exists) remains unripe, and because DuBoise fails to proffer a basis to assert an indemnity claim on behalf of

an officer defendant, each claim asserted against Tampa in Counts 8 through 11 warrants dismissal. Count 5 warrants further discussion.

In 1963, the Supreme Court decided *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which prohibits a prosecutor's failing to disclose on request "evidence favorable to an accused." In 1972, the Supreme Court decided *Giglio v. United States*, 405 U.S. 150, 153–55 (1972), which reiterates *Brady*'s disclosure obligation; extends the disclosure obligation to evidence that would materially impeach a prosecution witness; and recognizes that the "Government," not a specific prosecutor, owes the duty to disclose exculpatory evidence and that, consequently, *Brady* encompasses exculpatory evidence known to the government even if unknown to the individual prosecutor assigned to the case.* *Giglio* concludes that governments should promulgate "procedures and regulations . . . to [e]nsure communication of all relevant information on each case to every lawyer who deals with it." 406 U.S. at 154.

In 1983, Detectives K.E. Burke, Phillip Saladino, and John Counsman allegedly conspired to secure DuBoise's conviction for the murder of B.G., a minor, by falsifying bitemark evidence connecting DuBoise to the murder and by eliciting from two jailhouse informants — Claude Butler and Jack Andruskiewiecz — false

---

* *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("Since . . . the prosecutor has the means to discharge the government's *Brady* responsibility . . . any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."). *Kyles*, which no party cites, confirms that the government's *Brady* obligation encompasses evidence known by law enforcement and notes that any contrary conclusion "would . . . amount to a serious change of course from the *Brady* line of cases." Indeed, counsel for the prosecutors in *Kyles* conceded that, even before *Kyles*, "the State [was] 'held to a disclosure standard based on what all State officers at the time knew.'" *Kyles*, 514 U.S. at 438 n.11.

testimony that DuBoise had confessed to the murder. In securing DuBoise's conviction, the detectives allegedly failed to disclose to the prosecution or to the defense either "the true circumstances surrounding the 'bitemark' evidence" or evidence that would impeach or contradict the informants' testimony, including (1) evidence that, as a result of serious mental disorders, Butler suffered auditory and visual hallucinations; (2) evidence that the detectives met with Butler "five or six times," at which meetings Butler offered inconsistent reports of DuBoise's purported confession; (3) evidence that detectives administered to Butler a polygraph examination, which reported that Butler "had been deceptive" while recounting DuBoise's purported confession; and (4) evidence that detectives secured Butler's and Andruskiewiecz's testimony with "threats and inducements." (Doc. 62 at 13–18)

In Count 5, DuBoise claims under Section 1983 that the detectives' failure to disclose any exculpatory evidence was caused by (and was the obvious result of) the Tampa Police Department's "wholly fail[ing]" to train officers (1) how to handle forensic evidence; (2) how to interview, manage, and report on informants; or (3) how to (and the need to) document and disclose exculpatory evidence. In other words, DuBoise predicates his Section 1983 claim against Tampa primarily on the assertion that Tampa's failure to train officers constituted a policy of deliberate indifference to the rights of citizens. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989)  Moving (Doc. 63 at 7–8) to dismiss, Tampa primarily argues that DuBoise fails to demonstrate a pattern of similar misconduct necessary both to charge Tampa with notice of the need to train officers and, consequently, to state a claim for failure train. Also,

- 3 -

Tampa urges for dismissal of Count 5 because DuBoise "fails to identify a city policymaker" responsible for any alleged policy. (Doc. 63 at 15–16)

First, as *Connick v. Thompson*, 563 U.S. 51 (2011), suggests and as the weight of authority confirms, a city's "wholly fail[ing]" to train police officers about the constitutional requirement to maintain exculpatory evidence would "obviously" result in constitutional violations and thus charges the city with notice, even in the absence of a pattern of similar violations. *See Canton*, 489 U.S. at 390 ("But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is obvious, and the inadequacy so likely to result in the violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."); *Connick*, 563 U.S. at 65 (concluding that the failure to train prosecutors about *Brady*'s obligations would not obviously result in constitutional violations because "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles"); *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations."); *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 209–11 (E.D.N.Y. 2014) (Bianco, J.) ("[A] reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations.").

Further, as DuBoise notes (Doc. 68 at 18), a Section 1983 claim against a municipality must plausibly allege that a constitutional violation resulted from an "official policy" — not from an official policymaker. "[I]dentifying and proving that a policymaker acted on behalf of a municipality 'is an evidentiary standard and not a pleading requirement.'" *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016) (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002). Under *Hoefling*, 811 F.3d at 1280, the complaint need not name a specific policymaker.

For these reasons, Tampa's motion (Doc. 63) to dismiss is **GRANTED-IN-PART**. The claims against Tampa in Counts 8, 9, 10, and 11 are **DISMISSED**. Count 5 persists. Of course, whether the City of Tampa in fact "wholly fail[ed]" to train officers about the constitutional obligation to record and disclose exculpatory evidence is reserved for summary judgment or other proceedings.

Also, Jesse W. Isom's motion (Doc. 77) to withdraw as counsel for DuBoise is **GRANTED**. Jesse W. Isom is **WITHDRAWN**, and the clerk must terminate Isom from the service list.

## NOTE ON THE DECEASED OFFICER DEFENDANTS

Finally, the claims against two of the officer defendants — John Counsman and R.H. Price — warrant discussion. Because Counsman died in 2015 and Counsman's estate was closed the same year, DuBoise nominally sues "the estate of John Counsman" — a concededly improper party — and moves (Doc. 28) for appointment of a special representative of the estate. An order (Doc. 33) denies the motion and directs DuBoise to request a special representative in state court.

Reporting a pending state-court request to appoint a special representative, DuBoise moves (Doc. 63) unopposed to extend the time within which to name and serve the representative of Counsman's estate. According to the docket report for *In re: Estate of John L. Counsman, III*, Case No. 15-cp-981 (Fla. 13th DCA), the court denied (*Counsman*, Doc. 9) DuBoise's request to appoint a special representative and dismissed the action. Accordingly, the motion (Doc. 63) appears moot, and the claims against "the estate of John Counsman" apparently warrant dismissal.

Second, the defendants on June 27, 2022, filed (Doc. 74) a notice that Price died during this action's pendency. After notice of a party's death appears on the docket, Rule 25(a)(1) permits any other party to move to substitute a proper party for the decedent. But if the motion for substitution "is not made within 90 days after service of a statement noting death, the action by or against the decedent must be dismissed." Although more than ninety days has elapsed since the defendants filed the notice of Price's death, no motion to substitute a proper party appears. Thus, the claims against Price seemingly warrant dismissal under Rule 25(a)(1).

Not later than **OCTOBER 20, 2022**, DuBoise must explain why an order should not dismiss the claims against Counsman's estate and against Price.

ORDERED in Tampa, Florida, on October 3, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE