IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.: 8:21-CV-02328

ROBERT DUBOISE,                              Hon. Judge Steven D. Marryday
          Plaintiff,

v.

CITY OF TAMPA, RICHARD R.
SOUVIRON, et al
          Defendants,
_____/


**DEFENDANT RICHARD R. SOUVIRON'S AMENDED MOTION FOR
SUMMARY JUDGMENT**

## I.   INTRODUCTION

The Defendant, Richard Souviron, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 and this Court's Order [D.E. 125], hereby files this Amended Motion for Summary Judgment with the incorporated Statement of Material Facts.

## II.   STATEMENT OF MATERIAL FACTS

### Parties

1.   BG was found dead on August 19, 1983 in Tampa, Florida. *Exhibit A (Trial Testimony of Joseph Tietack on February 26, 1985)*.

2.   Defendant, Phillip Saladino, was assigned to be lead detective on the investigation into the death of BG. *Exhibit B (Deposition of Defendant Phillip Saladino November 22, 2022), at 23:7-15.*

3.   Defendants Burke, Counsman, and Price assisted in the investigation into the death of BG. *Exhibit B at 56:22-57:1, 82:18-20.*

4.   Doctor Lee Robert Miller ("Dr. Miller") served as Hillsborough County's Associate Medical Examiner at the time of the investigation into BG's death. *Exhibit C (Trial Testimony of Dr. Lee Robert Miller on February 26, 1985), at 529:3-8.*

5.   Claude Butler was an informant who testified on behalf of the prosecution during the 1985 trial against the Plaintiff. *Exhibit B, at 267:8-277:5.*

6. Defendant, Dr. Richard Souviron, is a forensic odontologist that provided expert testimony during the 1985 trial against the Plaintiff. *Exhibit D (Trial Testimony of Defendant Souviron on March 4, 1985), at 1159:2-23.*

7. Doctor Richard Powell was a dentist in Tampa, Florida, who assisted in the investigation into BG's death. Exhibit B at 137:10-14.

### Homicide Investigation and 1985 Trial

8. On or about August 19, 1983, Dr. Miller responded to the scene where BG's body was found, where he examined the scene and BG's body. *Exhibit C at 531:8.*

9. Between August 19 and August 20, 1983, Dr. Miller performed an autopsy of BG's body, including an internal and external examination and the gathering of evidence. *Exhibit C at 532:9-12.*

10. During the autopsy of BG's body, Dr. Miller found what he described as "a human bite mark on the left cheek." *Exhibit C at 536:11-12.*

11. Dr. Miller excised the tissue around the bite mark and improperly placed it in formaldehyde solution, which causes the tissue to shrink. *Exhibit C at 566:5-16.*

12. Given Dr. Miller's determination that a bite mark was left on BG's body, Saladino decided to enlist the services of Dr. Souviron to assist in the investigation. Exhibit B at 116:5-9.

13. Sometime in early September 1983 Dr. Souviron flew to Tampa, Florida, to meet with the investigators and see the bite mark. *Exhibit B at 116:5-116:6.*

14. From the moment Dr. Souviron saw the incised tissue he determined it was of little evidentiary value. *Exhibit B at 117:16-23.*

15. Dr. Souviron reviewed the tissue and made an initial determination that the possible suspect's dentition would reflect a "diastema between what would appear to be the right and left central incisors of approximately four to five millimeters, the left tooth, either the left central or lateral appears to be either turned or pointed or chipped." *Exhibit E (Dictation Note by Dr. Souviron on September 9, 1983).*

16. Prior to Dr. Souviron's involvement, the investigators developed a possible suspect by the name of Rodney Fletcher, and took dental impressions of Mr. Fletcher, his girlfriend Jarynette Catrice, and BG. *Exhibit E (Deposition of Defendant Saladino on February 6, 1985) at 13:5-20.*

17. Dr. Souviron ruled out Mr. Fletcher as a suspect based on his initial review of the available evidence. *Exhibit E at 13:5-20.*

18. Based on Dr. Souviron's initial findings, the investigators began focusing their investigation on suspects with "a missing tooth or maybe a gap [,] [o]r a tooth that [could] be turned sideways, anything that would be leaving a space... actually anybody that had any odd-looking teeth." *Exhibit E at 19:12-19.*

19. Dr. Souviron explained to the investigators that there were many variables that could account for the segment of the bite mark that had no impression on it, so not only could the suspect have a gap, the suspect could also have a tooth that is shorter or has been altered or deformed in some way. *Exhibit E at 20:5-20.*

20. Dr. Souviron suggested to the investigators that they should take dental impressions of possible suspects using beeswax and instructed them on how to have suspects bite into the beeswax. *Exhibit B at 134:11-22.*

21. The investigators would then take the beeswax impressions to Dr. Powell who would make stone casts from the impressions and send the stone casts to Dr. Souviron. Exhibit B at 137:10-14.

22.     At some point during the investigation, Saladino learned of Plaintiff's identity based on hearsay from other detectives involved in the investigation. *Exhibit B at 97:11-21.*

23. On or about October 12, 1983, Dr. Souviron received first generation casts of the dental impressions of at least three suspects, including the Plaintiff, for his review and comparison. *Exhibit F (Letter to Dr. Souviron Dated October 12, 1983).*

24.     On October 21, 1983, Dr. Souviron spoke with Saladino and informed him that his preliminary opinion was that the Plaintiff's dentition matched the bite mark on BG. *Exhibit G (Saladino Supplemental Report Dated October 25, 1983).*

25. The Plaintiff was arrested on October 22, 1983, and that same day volunteered to have Dr. Powell take first generation impressions of his teeth. *Exhibit E at 26:15-27:13.*

26.     On October 25, 1983, Dr. Souviron wrote to Saladino stating that in his opinion the Plaintiff did indeed inflict the bite wound found on BG and that both Ronald Setliff and Ronald Campbell were excluded based on their molds. *Exhibit H (Letter from Dr. Souviron to Saladino Dated October 25, 1983).*

27. The Plaintiff stood trial for the murder of BG sometime between February and March 1985, and was convicted of first-degree murder. *Exhibit I (Verdict Entered on March 7, 1985).*

28.     The Plaintiff was originally sentenced to death but the sentence was commuted to life in prison sometime in 1988. *DuBoise v. State*, 520 So. 2d 260, 266 (Fla. 1988).

## 2020 Investigation and Plaintiff's Exoneration

29.     During 2020 a new investigation by the Hillsborough County State Attorney's Office new DNA technology was used to test vaginal swabs originally taken from BG's body. *Exhibit J (Verified Motion for Post-Conviction Relief) at 4*.

30.     The re-testing of the available evidence in 2020 excluded the Plaintiff as the possible source of the DNA, and in fact pointed to a person unrelated to the Plaintiff as the source of the DNA. *Exhibit J at 4*.

31. The Plaintiff's 1985 conviction was vacated on September 14, 2020, and the Plaintiff was able to walk out of prison after 34 years. *Exhibit K (Order Vacating Charges)*.

## III.   ARGUMENT

### (a)  Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the party seeking summary judgment must establish that no genuine issue of material fact remains for trial, even when

seeing the evidence in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987).

A "material fact" is a fact that is essential to the resolution of the legal questions raised in the case. *See Department of Environmental Regulation v. CP Developers*, 512 So.2d 258, 261 (Fla. 1st DCA 1987). Disputes of fact do not arise merely because a party disagrees with the facts established by competent evidence submitted by the moving party in a summary judgment proceeding, nor merely because the nonmoving party would like the opportunity of having a jury pass upon such facts and make an independent determination as to the correctness thereof *See Robinson V. Loyola Foundation Inc.*, 236 So.2d 154, 160 (Fla. 1st DCA 1970).

For a non-moving party to prevail on summary judgement they cannot rest upon mere allegations or denials, but instead must point to specific facts showing the existence of a genuine dispute for trial. *See Anderson*, at 248 ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact"). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*, at 252.

### (b) Souviron is Not a State Actor and Therefore Cannot be Held Liable Under Section 1983.

Section 1983 impose civil liability on anyone "who, under color of any statute, ordinance, regulation, custom, or usage, of any State... subjects, or causes to be subjected, any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C § 1983. In determining if a private party acted under color of law, courts generally start with the presumption that private conduct does not constitute governmental action. *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835 (9th Cir. 1999). The Eleventh Circuit "recognizes three tests for establishing state action by what is otherwise a private person or entity: the public function test, the state compulsion test, and the nexus/joint actions test." *Harvey v. Harvey*, 949 F.2d 1127, at 1130 (11th Cir. 1992).

### i. Souviron Was Not a State Actor Under the Public Function Test.

Whether or not a private actor can be liable under the public function test turns on whether their actions "are traditionally the exclusive prerogative of the State." *Harvey*, at 1131. The Eleventh Circuit recognizes that "public function 'embraces very few activities'; even arrest, detention and search are not exclusively reserved to states." *Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992) citing *United States v. Cox*, 342 F.2d 167, 190 (5th Cir. 1965). The prosecution of crimes, not the investigation of them, has been found to be "an executive function within the exclusive prerogative of the Attorney General." *United States v. Cox*, 342 F.2d 167, 190 (5th Cir. 1965).

Certain actions that fall under the 'investigation' umbrella can certainly be exclusive to the state and delegable to a private party, such as a private medical doctor serving as deputy coroner in all child-death cases (as was the case in *Marsh*), or a blood-splatter analyst who is active in processing a homicide crime scene (as was the case in *Camm*). Other 'investigative' functions are more complex and require not the delegation of a basic state function to a third party, but instead the independent expertise of a third-party expert to aid the investigators in the interpretation and development of evidence.

Here, the conduct of Dr. Souviron is similar to that of another dentist in *Stinson v. City of Milwaukee*. In *Stinson*, Dr. Johnson was a dentist and oral surgeon who served as a forensic consultant for the Milwaukee County Medical Examiner's Office. On the day of the murder, Dr. Johnson and a forensic photographer went to examine the body at the scene and take photographs of bites on the breast of the victim. Dr. Johnson later returned, excised the bitemark, developed a sketch of what the possible perpetrator's dentition would look like, and shared his thoughts with the detectives. Based on that information the detectives zeroed in on a suspect and used Dr. Johnson's testimony to get a warrant to have the suspect undergo a thorough dental examination by Dr. Johnson, including providing molds and impressions of his dentition.

Dr. Johnson and the lead detective believed that they needed more to ensure a conviction, so they decided to bring in Dr. Rawson, a forensic odontologist, to provide a second opinion. Dr. Rawson was provided the pictures, molds, and

overlays for review. After a seemingly brief review, Dr. Rawson validated Dr. Johnson's findings and went on to testify in the same light as Dr. Johnson. The suspect was eventually convicted, and the defense did not present any expert to contradict either expert's testimony. In that case the Seventh District Court of Appeals upheld the District Court's denial of a Summary Judgment against the two doctors, which found that Dr. Johnson was a state actor because he served a public function, and that Dr. Rawson was a state actor because he satisfied the Nexus/Joint Action Test.

In this case, Dr. Souviron's actions are more like those of Dr. Rawson, not Dr. Johnson. Dr. Souviron was not the City of Tampa or Hillsborough County's go-to dental forensic consultant – that was Dr. Miller. It was Dr. Miller who first identified the bitemark on the victim, took the original photographs, and excised the wound. It was then Dr. Powell who created the stone molds that were sent to Dr. Souviron for analysis. It was Dr. Miller and Dr. Powell who had been delegated with the public function of initially processing and investigating the scene and related evidence, not Dr. Souviron.

More akin to the work performed by Dr. Rawson, Dr. Souviron came in to analyze evidence that had already been identified and processed by another dentist, and to apply his expertise to the evidence in front of him. Not surprisingly missing from the Plaintiff's Response is the fact that when Dr. Souviron was originally brought in to provide his expertise on the case, the detectives had developed a different suspect based on their independent investigation, and Dr.

Souviron in fact excluded that suspect from the list of possible suspects based on his initial analysis of the evidence.

### ii. Souviron Was Not a State Actor Under the Joint Action Test.

The Eleventh Circuit also recognizes "that a 'willful participant in joint activity with the State or its agents' is a state actor" *Charles v. Johnson*, 18 F.4th 686, 696 (11th Cir. 2021), and that "a private citizen can be held liable when he or she conspires with a state actor to deprive the plaintiff of his constitutional rights." *Id*. The Court recognizes, however, that "[b]ecause the joint action test applies to a broad array of factual scenarios, some cases nominally interpreting this test have used language that is unhelpful in its application to other scenarios." *Id* at 697. For those reasons it is particularly important to undergo a careful analysis of the facts and whether or not those facts show that Dr. Souviron was a willful participant in Detectives Burke and Saladino's alleged conspiracy to deprive the Plaintiff of his constitutional rights.

In reaching the conclusion that Dr. Souviron conspired with the detectives, the Plaintiff points to five alleged departures from the accepted forensic odontologist practices of the time in addition to a number of calls and meetings between them "that gave the Defendants the opportunity to conspire." Dkt 116 at 18. Nothing in the evidence developed thus far conclusively points to Dr. Souviron having *any* knowledge of the detectives' alleged conspiracy, much less enough to be considered a willful participant in that alleged conspiracy.

The Plaintiffs contentions as to Dr. Souviron's participation in the conspiracy are founded on his (1) alleged knowledge of the deficient nature of the bitemark tissue, (2) the angle at which the pictures of the bitemark were taken, (3) Dr. Souviron's recommendation to the detectives as to the use of beeswax, (4) his alleged identification of the Plaintiff from beeswax molds, and (5) his alleged change of analysis relating to the spacing of teeth in the bitemark at issue. Combine that with a few calls and meetings between Dr. Souviron and the detectives, and the Plaintiff will have you believe they have shown Dr. Souviron's knowledge of the alleged conspiracy.

Taking the Plaintiff's argument to its logical conclusion would have this Court believe that the forensic odontologist that provided expert testimony during the Plaintiff's original 1983 trial on behalf of the Plaintiff's defense team also had knowledge of the detective's alleged conspiracy. All five of Dr. Souviron's alleged departures can also be attributed to the Plaintiff's defense expert. In fact, both Dr. Souviron and the Plaintiff's expert at the time found the bitemark to be of evidentiary value, analyzed it as such, and provided testimony to back up their findings. While they disagreed on whether or not the Plaintiff actually caused the bitemark on the body of the victim, both experts agreed that it was a human bitemark worthy of forensic evaluation.

Additionally, while it is true that the detectives and the private party being accused of conspiring together can have different motives for entering into an understanding, the fact remains that they have to have known that their actions

were done with the intent to deprive Plaintiff of their constitutional rights. Here Dr. Souviron had no demonstrable knowledge whatsoever that the detectives were allegedly using his opinions to deprive the Plaintiff of his constitutional rights.

When Dr. Souviron was first approached, he was told that the detectives had a different suspect in mind. Dr. Souviron was able to quickly exclude that suspect, something the detectives were not even considering at the time. After instructing detectives on how to gather and maintain potential suspects' dental molds for exclusion, Dr. Souviron was sent at least three other sets of stone exemplars to review, without any indication whatsoever as to who the detectives wanted to allegedly frame.

### (c)  Souviron is Entitled to Immunity Based on Absolute and Qualified Immunity.

The Supreme Court has recognized two kinds of immunity which shield some official actions from liability which might otherwise arise under § 1983. One of them, qualified immunity, protects officials from liability when a reasonable official in the defendant's position would not have understood their actions to violate a person's constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The other, absolute immunity, applies to the performance of certain functions when those functions are integral to the functioning of our adversarial judicial system. *See Briscoe v. LaHue,* 460 U.S. 325, 345 (1983). The Supreme Court has carefully circumscribed the doctrine, however, because absolute immunity protects an official from liability even when the official acted with

knowledge of the constitutional violation. *Id.* Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity. *See id.*

### i. Souviron is Entitled to Qualified Immunity.

Government officials performing discretionary functions are immune from suit if their conduct does not violate clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 89 L.Ed.2d 271 (1986).

Once a qualified immunity defense is raised by the defendant, it is the plaintiff's burden to defeat it by identifying a close analogous case or describing conduct so plainly egregious that no reasonable police officer, or in this case an expert witness could have thought he was acting lawfully. Whether the law was clearly established should not be assessed at a high level of generality; but, rather, whether an objectively reasonable expert witness would have known that the officer's conduct was unconstitutional based on the specific facts and circumstances that defendant faced. *Mullenix v. Luna*, 136 S. Ct. 305 (2015).

Based on Plaintiff's position in response to a Motion to Dismiss, we anticipate they will rely on the following cases in an attempt to establish the existence of a clearly established constitutional right in this case [D.E. 22 at 25-27]: *Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (upholding district court's denial of qualified immunity to the forensic examiner who falsely reported that plaintiff's hair was a match); see also *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775154, at *4-5 (6th Cir. Oct. 13, 2021) (finding "viable constitutional violation" where " officers knowingly fabricated the match between the evidence bullets and the Rossi handgun") and *Stinson v. City of Milwaukee*, which is discussed more fully in Section (b)(i) above.

In the above-mentioned cases cited by Plaintiff there exists one common factor that is missing from the instant case: sufficient evidence of fabrication. In order to meet his burden in this case, the Plaintiff alleges that Dr. Souviron, conspiring with the other Defendants, changed his opinion as to an alleged gap in the suspect's teeth. The fabrication, as Plaintiff puts it, happened when Dr. Souviron allegedly changed his opinion in order to match his description of the bite mark with that of the Plaintiff's dentition. In his view, Dr. Souviron analyzed the bite mark and determined that it reflected a gap between the top two central incisors, which he communicated to the detectives. The detectives then proceeded to tell Souviron that they actually wanted him to change his testimony and ignore the alleged gap in order to help arrest and convict the Plaintiff. Dr. Souviron then

agreed to change his opinion and signaled Plaintiff as the one who inflicted the bite on BG. [D.E. 22]

Taking Plaintiff's position as true does not only require that all evidence be viewed in the light most favorable to him, as is the case when moving for summary judgment, it requires taking a scintilla of evidence and threading an entire narrative based on nothing but mere allegations and denials. To begin, the notion that Dr. Souviron characterized the bite mark as having a 'gap' is conveniently limited and reflects the weak foundation on which Plaintiff's case rests. Dr. Souviron told the investigators that not only could the space in the bite mark be as a result of a gap in the teeth, it could also be as a result of a turned or chipped tooth, having a shorter tooth, or otherwise having a deformity that would prevent those teeth from marking tissue upon biting. *See Exhibit B at 19-20*; *see also Exhibit E.* The possibility that the suspect did not have a "gap" in his teeth was not only explained but accounted for by Dr. Souviron from the very beginning; to claim that he decided to change his opinion based on conspiring with the investigators blatantly ignores the evidence in this case.

### ii. Souviron is Entitled to Absolute Immunity.

In Briscoe v. LaHue, 460 U.S. 325, 103 S. Ct. 1108, (1983) the United States Supreme Court established that a trial witness has absolute immunity with respect to any claim based on witness testimony. Absolute immunity from § 1983 liability involves a functional approach granting immunity based on conduct, not just the fact that an individual testified during trial. Jones, 174 F.3d at 1282. This functional

approach looks to "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993). *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010), aff'd, 566 U.S. 356, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012).

A determination on absolute immunity under § 1983 turns on whether or not a particular function can be "intimately associated with the judicial phase of the criminal process. *Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999). "If the function is similar to a function which would have been immune when Congress enacted § 1983, and if a court determines that § 1983's history or purposes support special protection for the activity, then the court will recognize the absolute immunity of the official from damages liability," *Id.* at 268–69, and the burden is on the party claiming absolute immunity to show that such immunity is justified. *See Malley v. Briggs*, 475 U.S. 335, 344–45 (1986).

The Eleventh Circuit has also stated that "a plaintiff cannot strip a § 1983 defendant of his qualified immunity by citing to general rules or abstract rights." *See Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. 3034; *Walker v. Schwalbe,* 112 F.3d 1127, 1132 (11th Cir.1997) ("Plaintiffs may not discharge their burden [of showing that a right is clearly established] by referring to general rules and abstract rights."), *cert. denied,* *1283 523 U.S. 1117, 118 S.Ct. 1794, 140 L.Ed.2d 935 (1998). "Qualified immunity focuses on the actual, specific details of concrete cases." *Id.* (citing *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, at 1149–50).

17

Here the Plaintiff relies on two main arguments when claiming Dr. Souviron is not entitled to absolute immunity. First, they claim that Dr. Souviron's actions were not testimonial, but rather investigatory. Second, they claim that Dr. Souviron fabricated evidence. The second issue is addressed more thoroughly under Section (c)(i) of this Motion and the Court is directed there to see the ways in which Plaintiff's arguments fail there. As to the first argument, however, the Plaintiff inappropriately groups the actions of three different odontologists to assert that Dr. Souviron's conduct was non-testimonial but rather investigative. Dr. Souviron did not participate in the investigation of the scene where BG's body was found, and he did not participate at all in the autopsy or incision of the bite mark from BG's face. It was doctor Miller who conducted the initial investigation of BG's body and the bite mark, and it was Dr. Powell who poured the stone casts that were sent to Dr. Souviron's examination. The only activity that Plaintiff can remotely characterize as non-testimonial was Dr. Souviron's recommendation for the use of beeswax in taking suspects' dental impressions. That recommendation was for purposes of evidence preservation and subsequent examination, not an investigatory action that strips Dr. Souviron of his absolute immunity.

## IV.   CONCLUSION

While the circumstances associated with this case and the Plaintiff's wrongful conviction in 1985 are truly tragic, letting the Plaintiff survive summary judgment based on unsubstantiated claims and platitudes would be yet another travesty of justice. The law is clear and this Court should not throw the Plaintiff a

lifeline because the Plaintiff, without concrete facts, claims that Dr. Souviron changed his testimony knowing it would deprive the Plaintiff of his constitutional rights. It is true that the Plaintiff himself was a victim, just not of Dr. Souviron's conduct. The Plaintiff was a victim of the ephemeral nature of certain 'advancements' in technology and the lawful ways in which courts and juries rely on those same advances to reach a final determination. The Court in 1985 allowed Dr. Souviron's testimony and that of the Plaintiff's own expert because precedent allowed it to, and the jury convicted the Plaintiff because they believed Dr. Souviron's testimony more. A common phrase says hindsight is 20/20; unfortunately for the Plaintiff, however, this Court is not afforded hindsight when analyzing the conduct of Dr. Souviron between 1983 and 1985 and as such, the case against Dr. Souviron should be summarily dismissed as a matter of law.

Dated: June 16, 2023.

**NICKLAUS & ASSOCIATES, P.A.**
4651 Ponce de Leon Blvd., Suite 200
Coral Gables, Florida 33146
Telephone: 305-460-9888
Facsimile: 305-460-9889
edwardn@nicklauslaw.com
nicolast@nicklauslaw.com

By: /s/ Nicolas Torres, Esq.
**NICOLAS TORRES, ESQ.**
Florida Bar No.: 1004232
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.: 138399

## CERTIFICATE OF SERVICE

I hereby certify that on June 16th, 2023, I electronically filed the foregoing document with the Clerk of the Court using CMIECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Nicolas Torres, Esq.
**NICOLAS TORRES, ESQ.**
Florida Bar No.: 1004232
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.: 138399

## SERVICE LIST

| | |
|---|---|
| Daniel Marshall, Esq.<br>Jesse Isom, Esq.<br>HUMAN RIGHTS DEFENSE CENTER<br>P.O. Box 1151<br>Lake Worth, FL 33460<br>Tel: (561) 360-2523<br>dmarshall@humanrightsdefensecenter.orgjwisom@humanrightsdefensecenter.org<br>*Attorneys for Plaintiff, Robert DuBoise* | Edward R. Nicklaus, Esq.<br>NICKLAUS & ASSOCIATES, P.A.<br>4651 Ponce de Leon Blvd., Suite 200<br>Coral Gables, Florida 33146<br>Telephone: 305-460-9888<br>Facsimile:  305-460-9889<br>edwardn@nicklauslaw.com<br>nicolast@nicklauslaw.com<br>*Attorneys for Dr. Richard R. Souviron, D.D.S.* |
| Jon Loevy<br>Gayle Horn<br>Heather Lewis Donnell<br>LOEVY & LOEVY<br>311 N. Aberdeen St.<br>Chicago, IL 60607<br>(312) 243-5900<br>*Attorneys for Plaintiff, Robert DuBoise* | Andrew I. Dayes, Esq.<br>DAYES LAW FIRM<br>727 2nd Street South<br>Safety Harbor, Florida 34695<br>Telephone: 727.240.1332<br>Facsimile: 727.440.8188<br>Email: aid@dayeslaw.com<br>*Counsel for Saladino, Price, and Burke* |
| | David Harvey, Esq.<br>City Attorney's Office<br>315 E. Kennedy Blvd., 5th Floor<br>Tampa, FL 33602<br>Telephone: (813) 274-8791<br>David.Harvey@tampagov.net<br>*Counsel for Defendant City of Tampa* |